UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| OSF HEALTH CARE SYSTEM, an Illinois not for profit corporation d/b/a SAINT FRANCIS MEDICAL CENTER,<br><br>Plaintiff,<br><br>v.<br><br>PEKIN LIFE INSURANCE COMPANY,<br><br>Defendant. | Case No. 09-cv-1151 |

## O R D E R  &  O P I N I O N

Before the Court is Plaintiff's Motion for Leave to Amend the Request for Damages (Doc. 34); Plaintiff's Motion for Summary Judgment (Doc. 35); Defendant's Motion to Compel (Doc. 39); and Plaintiff's Motion for Leave to File Reply to Defendant's Response to Plaintiff's Motion for Summary Judgment (Doc. 42).[1]

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY[2]

Plaintiff provided medical goods and services to Howard Perkins from May 3-8, 2007. (Doc. 35 at 2). Plaintiff billed Defendant $95,628.60 for these services. (Doc. 35 at 2). Upon receipt of the bill, Defendant forwarded it to an outside contractor for review because the bill reflected "a lot of charges" for medical surgical

---

[1] Plaintiff's Motion for Leave to File Reply to Defendant's Response to Plaintiff's Motion for Summary Judgment (Doc. 42) is hereby GRANTED.
[2] These background facts reflect the Court's determination of the undisputed facts, unless otherwise noted. Facts that are omitted are immaterial; if an included fact is immaterial to the Court's determination, this will be noted.

supplies, as well as charges for nursing increments. (Doc. 35-13 at 21). The outside contractor manually entered the billing information into a computer program. (Doc. 35-1 at 15). The computer program then flagged certain charges as being inappropriately billed and/or coded. (Doc. 35-1 at 16-17). In reliance on the program's analysis, the contractor recommended that Defendant pay $69,435.30 to Plaintiff for the May 2007 medical treatment, and deny payment for certain medical goods and services totaling $21,118.35 on the ground that they were improperly billed.[3] (Doc. 35-13 at 27). Without performing any independent analysis of its own, Defendant accepted the contractor's recommendation, paying Plaintiff $69,435.30 and denying, as improperly billed, payment for goods and services billed in the amount of $21,118.35. (Doc. 35-13 at 26-7; Doc. 14-4 at 2). The reason cited for the denial of payment for such goods and services is that such goods and services should have been "bundled" into other costs; consequently, such charges are considered duplicative when billed separately. (Doc. 35-13 at 29; Doc. 35-2 at 11).

Plaintiff disagreed with Defendant's determination and appealed the decision with Defendant. In support of its appeal, Plaintiff claimed that such charges were usual and customary, that it bills all patients this way, and that such charges were not duplicative of other charges because Plaintiff minimizes its bundling of charges to save patients money. The Defendant, relying again on the advice of the very same outside contractor, refused to change its position. (Doc. 31 at 2).

The agreement that existed between the contractor and Defendant was that the contractor would get paid 30% of whatever charges were disputed. (Doc. 35-1 at

---

[3] The $21,118.35 reflects amounts billed for nursing care ($6,224), anesthesia services ($3,811.50), and surgical supplies ($11,082.85). (Doc. 35-4 at 1).

15). However, the contractor was paid nothing if it failed to identify charges for dispute. (Doc. 35-13 at 25). The Defendant cannot remember a time when it sent a bill to the contractor for review and the contractor did not identify charges for dispute. (Doc. 35-13 at 25). The Defendant's sole justification for refusing to pay Plaintiff for the goods and services billed in the amount of $21,118.35 is its reliance on the contractor's conclusion that such charges were improperly billed. (Doc. 35-14 at 11; 35-13 at 27).

On March 30, 2009, Plaintiff filed a Complaint alleging breach of insurance contract in the Circuit Court for Peoria County, Illinois. On April 29, 2009, Defendant timely removed this action, asserting federal question jurisdiction pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA").

**LEGAL STANDARD**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying the evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24 (1986). If the moving party meets this burden, the nonmoving party cannot rest on conclusory pleadings but "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Serfecz v. Jewel Food Stores,* 67 F.3d 591, 596 (7th Cir. 1995) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86

(1986)). A mere scintilla of evidence is not sufficient to oppose a motion for summary judgment; nor is a metaphysical doubt as to the material facts. *Robin v. Espo Eng. Corp.,* 200 F.3d 1081, 1088 (7th Cir. 2000) (citations omitted). Rather, the evidence must be such "that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.,* 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

In considering a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Abdullahi v. City of Madison,* 423 F.3d 763, 773 (7th Cir. 2005) (citing *Anderson,* 477 U.S. at 255). The court does not make credibility determinations or weigh conflicting evidence. *Id.*

## ANALYSIS

The Court will first address Plaintiff's Motion for Leave to Amend the Request for Damages. (Doc. 34). On December 8, 2009, Plaintiff filed an Amended Complaint alleging its entitlement to $14,782.45 in damages – an amount equal to 70% of the charges disputed by Defendant.[4] On July 8, 2010, Defendant's director of claims testified that Defendant would have been responsible for 100% of the disputed charges if they had been properly billed. (Doc. 35-14 at 5-6). On April 6, 2011, Plaintiff filed the instant motion seeking to amend the amount of damages being sought to $21,118.35. As its sole justification for seeking leave to upwardly

---

[4] Plaintiff only sought 70% of the $21,118.35, or $14,782.45, because it believed that the plan at issue in this litigation only required Pekin to pay 70% of properly billed charges for Perkins' medical care. (Doc. 14-4 at 2, 10, 13; Doc. 14 at 2).

4

amend the damages claim, Plaintiff cites Defendant's deposition testimony of July 8, 2010. The Defendant objects to Plaintiff's motion on the grounds that it is "untimely, prejudicial and futile."

In the absence of Defendant's consent to the amendment, F.R.C.P. 15(a)(2) requires Plaintiff to seek leave of the Court, which the Court is required to grant when justice so requires. However, the Court may deny the proposed amendment if the moving party has unduly delayed in filing the motion, if the opposing party would suffer undue prejudice, or if the pleading is futile. *Campania Management Co. v. Rooks, Pitts & Poust*, 290 F.3d 843, 848-49 (7th Cir. 2002).

The Court agrees with Defendant that the proposed amendment is untimely and prejudicial. With respect to timeliness; Plaintiff has failed to explain why it took nearly nine months after discovering this new evidence for Plaintiff to file the instant motion seeking leave to amend. With respect to prejudice; Plaintiff waited until the last possible moment to file the instant motion. Discovery closed on March 11, 2011 and the deadline for filing dispositive motions was April 6, 2011 – the same date the instant motion was filed. To allow Plaintiff to amend under these circumstances would essentially permit the Plaintiff to ambush Defendant on the eve of trial. The Court will not condone such gamesmanship. Consequently, the Court DENIES Plaintiff's Motion for Leave to Amend the Request for Damages.[5]

Next, the Court will address Defendant's Motion to Compel. During discovery, Defendant requested a copy of Plaintiff's charge master or "Price List." In response, Plaintiff produced a Price List of charges related to Perkin's account.

---

[5] In light of this ruling, Plaintiff will only be entitled to collect an amount equal to 70% of those charges that the Court concludes were properly billed and, thus, were denied improperly.

Plaintiff states that it believed in good faith that this was responsive and also more useful, since the master Price List was 3,816 pages. Furthermore, the Defendant subsequently took the deposition of Plaintiff's Chief Financial Officer – and at no time during the deposition or up to the close of discovery did the Plaintiff again mention its desire to obtain a master Price List. Notwithstanding this, Defendant argues that it needs a copy of the master Price List in order to determine the "critical issue" in this case, which Defendant states is "whether Plaintiff double-billed [Defendant] by unbundling charges which it already factored in to Perkins operating room fee and room and board rate." (Doc. 39 at 1).

The Court declines to accept Defendant's invitation to compel Plaintiff to produce the master Price List on the ground that such request is untimely and prejudicial. The motion is untimely because discovery closed on March 11, 2011 – yet, the instant motion was not filed until April 27, 2011. The Defendant has failed to demonstrate good cause for such delay. Furthermore, the motion is prejudicial because (1) it would require additional time to review, thus delaying a trial, and (2) it could create new questions which are unable to be answered because discovery is now closed. Consequently, the Court DENIES Defendant's Motion to Compel.

Third and finally, the Court will address Plaintiff's Motion for Summary Judgment. As a preliminary matter, the parties contest what standard of review the Court should apply to Defendant's decision to deny certain of Plaintiff's billed charges totaling $21,118.35. Plaintiff cites the case of *Perlman v. Swiss Bank Corp. Comprehensive Disability Protection Plan*, 195 F.3d 975, 980 (7th Cir. 1999) for the proposition that "Decisions of ERISA plan administrators presumptively receive *de*

*novo* review." However, Defendant argues that its decision is entitled to deference, subject to reversal only if found to be "arbitrary and capricious." *See Foster McGaw Hosp. of Loyola University of Chicago v. Building Material Chauffeurs, Teamsters and Helpers Welfare Fund of Chicago*, 925 F.2d 1023, 1025-26 (7th Cir. 1991) (Deferential standard of review appropriate where plan grants trustees the power to construe the plan's terms). As evidence showing that the plan gives Defendant the power to construe its terms (at least as they relate to the payment of benefits), Defendant cites language in the plan which states that a "regular, reasonable & customary" charge shall be "the reasonable charge *as determined* by Pekin Life Insurance Company, based upon the Regular, Reasonable & Customary percentile level purchased by the Policyholder *and factors deemed appropriate* by Pekin Life Insurance Company." (Doc. 35-16 at 10) (emphasis added). To answer this question, the Court will briefly discuss the law governing judicial review of ERISA claims.

Ordinary disputes over ERISA benefit claims typically result in the burden of proof being borne by the plaintiff in accordance with the principles articulated in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989). Under that decision, where the plan document grants discretionary authority to interpret the plan language, the courts will accord deference to the plan fiduciary's interpretation of the plan and disposition of a claim for benefits. In such cases, the court will apply an abuse of discretion/arbitrary and capricious standard of judicial review. By contrast, those plans which do not give plan fiduciaries discretionary authority to interpret the terms and conditions of the plan will be subject to a *de novo* standard of judicial review.

Even in those cases where the Court concludes that the appropriate standard for reviewing a benefits claim is abuse of discretion, the burden of proof does not sit irrevocably on the shoulders of the claimant. Both before and after the *Bruch* decision, the Seventh Circuit has recognized that where a benefit claim decision implicates the interests of the decision maker, the deferential standard of judicial review may be altered. In *Van Boxel v. Journal Co. Employees' Pension Trust*, 836 F.2d 1048 (7th Cir. 1987); *accord Mers v. Marriot Int'l Group Accidental Death & Dismemberment Plan*, 144 F.3d 1014 (7th Cir. 1998), the Court referred to a sliding scale of judicial review that is influenced by the degree of interest which the plan decision maker has in the outcome of a claim. Consequently, "the greater the conflict of interest of [the administrator], the less [the Court] defer[s] to a denial of benefits that appears to be wrong." *Van Boxel*, 836 F.2d at 1053.

Based on the plain language of the plan at issue in this case (the "Plan"), it is clear that the Plan confers authority on the Defendant to construe and apply the terms of the Plan to determine whether a benefit is properly payable. Ordinarily, this would entitle Defendant's benefits determinations to a highly deferential level of judicial review. However, for the reasons to follow, the Court concludes that such deference is not merited in this case.

As discussed, *supra*, it is undisputed that (1) Defendant forwarded Plaintiff's claim to a third party for review; (2) the third party was paid when, and only when, it found charges to dispute; (3) the third party found charges to dispute; (4) in reaching its decision to deny $21,118.35 worth of goods and services, the Defendant relied exclusively on the third party's determination that certain charges should be

disputed; and (5) Defendant has no knowledge whether the third-party's review is accurate/correct. Furthermore, Defendant is unable to recall a time when it sent the third party a bill and issues were not identified.

Based on the foregoing, the Court is left with a firm sense that a conflict of interest existed when Plaintiff's claim was reviewed. The Defendant in this case delegated full review authority to a third party with the understanding that such third party would get paid a commission for each item that it identified for dispute. It is difficult to imagine a situation where a greater conflict of interest could exist. Consequently, while the Court is required to apply an arbitrary and capricious standard of review to Defendant's benefits determination, the Court will review this determination with "more bite" than it otherwise would. *Chojnacki v. Georgia-Pacific Corp.*, 108 F.3d 810, 815 (7th Cir. 1997).

In the words of Defendant, "The factual question that drives this dispute is uncomplicated: Plaintiff asserts it properly billed for medical services provided to Pekin's insured (Perkins), and Pekin asserts that certain charges are not covered under the Plan *because* Plaintiff unbundled, or double-billed, those charges, in violation of standard billing guidelines." (Doc. 40 at 7) (emphasis added). Consequently, the real question is whether there is sufficient evidence in the record from which Pekin could have reasonably concluded that Plaintiff double-billed it for certain charges. If there is, then the Court will not disturb Defendant's denial. However, where there is not sufficient evidence that certain billed goods and/or services represent double-billing, Defendant will be required to pay Plaintiff

9

seventy percent[6] of the amount billed for such goods and/or services, since it is admitted that all of the treatment received by Perkins was covered under the Plan. (Doc. 35-13 at 18).

The undisputed evidence indicates that Plaintiff unbundles certain charges in an effort to be more equitable and to save patients money. (Doc. 35-10 at 7-8). This decision to unbundle charges was made by a committee at Plaintiff's hospital after the committee determined that not all surgeries are the same and it would be inappropriate to make every patient pay for certain services that a number of them don't actually use. (Doc. 35-10 at 7-8; Doc. 35-9 at 26-7). The hospital bills all patients the same way (i.e. by unbundling certain charges), and there is no evidence that other insurance companies have taken issue with the way Plaintiff charges patients. (Doc. 35-9 at 8). Finally, Plaintiff performed an audit of Perkins' bill and confirmed that Perkins was not double-billed for any charges. (Doc. 35-7 at 10-11).

Defendant attempts to indirectly prove that Perkins was double-billed by pointing to a number of medical billing manuals/sources which, it claims, support its claim of double-billing. The Court will examine these sources as they apply to each of the three disputed areas which include nursing charges, anesthesia charges, and surgical supplies charges.

With respect to the nursing charges; Plaintiff has billed for two types of nursing services – (1) ICU nursing services, and (2) "intermediate" nursing services.

---

[6] For the sake of clarity, the Court once again wishes to note that the 70% figure comes directly from Plaintiff's Amended Complaint. (Doc. 14). Therein, Plaintiff claimed that it was only entitled to 70% of the amounts billed Defendant. (Doc. 14 at 2). Because the Court denied, *supra*, Plaintiff's Motion to Amend the Request for Damages (Doc. 34), Plaintiff may only collect 70% of those amounts which were properly billed Defendant and remain unpaid.

Defendant argues that it is not responsible for these nursing charges because medical billing procedures do not allow nurses to bill separately for their services. Defendant notes that this is in contrast to physicians and physician assistants, who may bill separately for their services. Plaintiff agrees that nurses may not bill directly (i.e. under a provider number) for their services, but Plaintiff explains that the hospital itself may bill for their services. (Doc. 35-10 at 25). According to Ingenix, the source cited by Defendant which takes into account the billing rules of various organizations, "in recognition of the extraordinary care furnished to intensive care . . . inpatients, the costs of routine services furnished in these units are separately determined. If the unit does not meet the definition of [ICU], then the cost of such service cannot be included in a separate cost center . . . ." (Doc. 35-8 at 22). There is no dispute that the ICU unit of the hospital qualified as an ICU unit. Consequently, it is clear that (1) Plaintiff was permitted to bill for ICU services above and beyond those services provided in a routine care unit and (2) that doing so does not represent double-billing. However, the Court's conclusion is different with respect to the intermediate nursing services rendered to Perkins. According to Ingenix, "Some hospitals have units that provide a level of care between other general routine and intensive care. These units are typically designated as . . . intermediate care units . . . [such] units are considered part of the total spectrum of general routine care . . . ." (Doc. 35-8 at 22). This language indicates that it is inappropriate for a hospital such as Plaintiff to bill separately for intermediate care nursing charges, since this type of care is considered routine, which should be factored into the room and board charge. (Doc. 35-1 at 23; Doc. 35-

7 at 14). Consequently, the Court is unable to conclude that Defendant abused its discretion in denying the charges for intermediate nursing care. In light of the foregoing, the Court concludes that Defendant must pay seventy percent of the amounts billed for ICU nursing care, but that the Defendant need not pay for the intermediate care nursing charges billed by Plaintiff.

With respect to the anesthesia charges; anesthesia services are professional services for which a direct charge may be made. (Doc. 35-11 at 3). Defendant's explanation regarding why it denied these charges appears to have changed over time. Initially, Defendant denied the anesthesiology charges because Plaintiff failed to submit the provider identification number of the anesthesiologist along with the bill. (Doc. 35-12 at 18). However, Defendant now says that it denied the anesthesiology charges because they were already bundled into the operating room charge. (Doc. 35-1 at 24). After reviewing the Record, the Court concludes that there is no evidence to support Defendant's position. Plaintiff properly seeks reimbursement for professional anesthesiology services rendered to Perkins, and Plaintiff is entitled to payment for such services in the amount of seventy percent of the denied amount.

Finally, the Court must address the charges for surgical supplies. The Record indicates that Plaintiff billed for a vast number of supplies. Included in these supplies is everything from a surgical gown ($144) and instant cold pack ($28) to a cautery machine ($178) and scalpel ($19). (Doc. 35-12 at 1, 14). According to Ingenix, the source cited by Defendant to justify its denial of certain surgical supplies; "Supply items are those items used in the treatment of patients – such as

12

trays, gowns, casting materials, and needles. Some items are eligible for payment and others are considered part of the cost of doing business as a hospital." (Doc. 35-7 at 26). Whether a supply item is reimbursable or not depends on whether the item is a "routine" supply, or a "nonroutine" supply. (Doc. 35-7 at 26). Unfortunately, an all-inclusive list of what is considered routine versus nonroutine does not exist, and can vary across medicare contractors. (Doc. 35-7 at 26). "Therefore, each supply item needs to be evaluated to determine whether it is separately billable or not." (Doc. 35-7 at 26). Ingenix considers the following to be examples of routine supplies; prepackaged wound kits (Doc. 35-7 at 26); gloves, diapers, linen savers, lemon swabs, toothettes, admission kits, bedpans, and specimen collection containers (Doc. 35-7 at 27); pads, drapes, cotton balls, urinals, irrigation solutions, ice bags, IV tubing, pillows, towels, bed linen, diapers, soap, tourniquets, qauze, prep kits, oxygen masks and oxygen supplies, or syringes (Doc. 35-7 at 28); wall suction, heating pads, reusable items, saline solutions, blood pressure monitors, thermometers, and IV pumps (Doc. 35-8 at 1); cardiac monitors, anesthesia machines, lasers, and rental equipment (Doc. 35-8 at 9). On the other hand, Ingenix considers the following to be examples of reimbursable supplies; "surgery packs" (so long as the hospital doesn't double bill for both the pack and the individual items in the pack) (Doc. 35-7 at 28); surgical supplies (not take home), splints, casts, trusses, and artificial legs and arms and supplies incident to diagnostic testing. (Doc. 35-8 at 4).

Having reviewed the various supply items charged for, the Court finds it unnecessary to address the propriety of each individual item. Suffice it to say that

it was not an abuse of discretion for Defendant to deny most of these charges. However, in accordance with the above-referenced list, the Court concludes that it was an abuse of discretion for Defendant to deny the two items charged as "Drape Proc. Pack/Kit/Tray." As surgery packs, these items are properly chargeable and reimbursable. *See* list, *supra*; *see also* Doc. 35-7 at 28 ("Medicare will cover supplies used in surgery when they are billed as a pack or individually.") Consequently, Plaintiff is entitled to be paid seventy percent of the amount billed for "Drape Proc. Pack/Kit/Tray."

CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Leave to Amend the Request for Damages (Doc. 34) is DENIED; Plaintiff's Motion for Summary Judgment (Doc. 35) is GRANTED in part and DENIED in part;[7] and Defendant's Motion to Compel

---

[7] Defendant argues that the Court cannot address the merits of Plaintiff's Motion for Summary Judgment on the ground that the Assignment of Benefits was never properly authenticated. However, the Court considers this argument waived for two reasons. First, the authenticity of the Assignment was raised for the first time in Defendant's Response to Plaintiff's Motion for Summary Judgment (Doc. 40). With respect to Defendant's Answer and Defenses, it is true that Defendant claimed that the Assignment of Benefits executed by Perkins was not a "valid assignment" on the ground that "it is no more than a direct payment and release authorization." (Doc. 4 at 5). However, this defense (which Defendant subsequently waived) fails to call into question the authenticity of the document itself. Second, when Defendant was asked what issues it had with paying Plaintiff, the only issues Defendant noted were those identified by the outside contractor. In light of the foregoing, the Court concludes that Defendant has waived its right to challenge the authenticity of the Assignment of Benefits.

(Doc. 39) is DENIED. The Clerk is DIRECTED to ENTER JUDGMENT in favor of Plaintiff and against Defendant in the amount of $7,300.65.[8] IT IS SO ORDERED.

CASE TERMINATED.

Entered this 13th day of July, 2011.

                                                                    s/ Joe B. McDade
                                                                  JOE BILLY McDADE
                                          United States Senior District Judge

---

[8] The Court arrives at this figure as follows: ICU charges = ($880 + $1,920 + $1,120) = $3,920; Anesthesia charges = ($2,875 + $936.50) = $3,811.50; Supplies (Drape Proc. Pack/Kit/Tray, 2 @ $1,349) = $2,698. 70% of these amounts ($3,920 + $3,811.50 + $2,698) = $7,300.65.